**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA**                                        **PLAINTIFFS**
**ex rel. PAUL MONTGOMERY, et al.**

**v.**                                        **NO. 4:05-CV-00899 GTE**

**ST. EDWARD MERCY MEDICAL**
**CENTER and DAVID MARK McCOY,**
**M.D. (a.k.a D. MARK McCOY, M.D.)**                                        **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER OF DISMISSAL**

Before the Court are two Motions to Dismiss, one filed by Separate Defendant St.

Edward Mercy Medical Center ("St. Edward") and a second filed by Defendant Dr. David Mark

McCoy ("Dr. McCoy"). Both motions request the dismissal of Plaintiff's Amended Complaint.

For cause, Defendants assert: (1) a lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1); (2) a

failure to state facts upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6); and

(3) a failure to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).

The issues presented have been fully briefed by the parties. For the reasons stated below,

the Court concludes that it lacks subject matter jurisdiction over the False Claims Act claims

asserted by the Relator Paul Montgomery ("Montgomery") and Lonnie E. Harrison, M.D. ("Dr.

Harrison" or "Harrison"). Because the United States has not intervened, the Court's decision

requires that the entire case be dismissed. Because the issue of subject matter jurisdiction is

dispositive, the remaining issues need not be addressed,[1] although the obvious deficiencies are discussed to some degree in connection with the jurisdictional analysis.

## I.   PROCEDURAL HISTORY

Relators Paul Montgomery and Lonnie Harrison, M.D. bring this action pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.  The relators contend that the Defendants submitted false or fraudulent claims to Medicare, Medicaid, TRICARE, and other federal health insurance programs for medically unnecessary surgical procedures, thereby violating § 3729 of the FCA.

The initial Complaint was filed under seal on April 22, 2005, in the Eastern District of St. Louis, St. Louis Division.  The case was later transferred to this district, where it was filed on June 5, 2005.  The Complaint[2] names five entity defendants and two individual defendants in addition to St. Edward and Dr. McCoy.[3]  The Complaint alleged a broad scheme to defraud the government by submitting "false or fraudulent claims to Medicare, Medicaid, TRICARE, and other federal health insurance programs for medically unnecessary surgical and interventional procedures and for medical consultation services that were not performed."[4]

---

[1] *See U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 11162 n. u (10th Cir. 1999).

[2] Throughout this Order, "Complaint" refers to the initial Complaint filed on June 20, 2005 and "Amended Complaint" refers to the Amended Complaint filed October 12, 2006.

[3] The other Defendants included Sisters of Mercy Health System;  Cooper Clinic, P.A.; Sparks Health System;  Sparks Regional Medical Center of Fort Smith, LLC;  Western Arkansas Heart, Lung, and Vascular Surgical Associates, P.A.;  Timothy Waack, M.D.;  and Riley D. Foreman, D.O.

[4] Complaint at ¶ 1.

On June 16, 2006, after being granted several extensions of time to consider the matter, the United States advised the Court of its decision not to intervene in the action.[5]  Subsequently, the Complaint was unsealed and served upon the Defendants by the Relators pursuant to 31 U.S.C. § 3730(b).

On October 12, 2006, Relators Montgomery and Dr. Harrison filed their First Amended Complaint.  St. Edward and Dr. McCoy are the only Defendants named in the Amended Complaint.  The Amended Complaint alleges that the two Defendants knowingly defrauded the United States by one or more of the following:

> a.   From April 1999, and earlier, McCoy knowingly and systematically billed to and collected from Medicare and other government health care programs false claims for payment of medically unnecessary surgical procedures performed at St. Edward;
>
> b.   From April, 1999, and earlier, St. Edward has knowingly and systematically billed to and collected from Medicare and other government health care programs false claims for payment of hospital patient services and facilities related to the medically unnecessary surgical procedures performed by McCoy; and
>
> c.   Since at least 2001, McCoy has knowingly and systematically billed to and collected from Medicare and other government health care programs false claims for payment of medically unnecessary surgical and procedures [sic]  performed at Sparks.  As a further result of his conduct, McCoy caused Sparks to submit claims for hospital services, items and facilities furnished in connection with the medically unnecessary cardiac and vascular surgical procedures performed by McCoy at its facilities.[6]

---

[5]  See Docket #21.

[6]  Amended Complaint, ¶ 24, emphasis in original.

Both Defendants have filed separate motions to dismiss.  Therein, they challenge this Court's subject matter jurisdiction.  Defendants further contend that the Relators have failed to state a claim pursuant to Fed. R.  Civ. P. 12(b)(6), because they have failed to plead their fraud related allegations with the specificity required by Fed. R. Civ. P. 9(b).  The Relators oppose both motions.

The motions have been exhaustively and fully briefed.  The Court had scheduled this matter for oral argument, at Dr. McCoy's request, on Thursday, September 27, 2007.  By Letter Order dated September 25, 2007, the Court advised the parties of its conclusion that jurisdiction was lacking and cancelled the oral argument.

## II.    REVIEW OF THE AMENDED COMPLAINT

The Amended Complaint alleges that from April 1999, and earlier, Dr. McCoy "knowingly, systematically, routinely and repeatedly submitted false claims to and received reimbursements from Medicare and other federal health care programs for medically unnecessary bypass grafts performed in conjunction with otherwise medically necessary surgeries."[7] Defendant St. Edward is alleged, during the same time period, to have submitted false claims to and received reimbursements from Medicare and other federal health care programs in connection with such medically unnecessary procedures performed by Dr. McCoy at its facilities.[8]

Under the CPT codes used to report physician coronary artery bypass procedures to Medicare, the greater the number of grafts, the greater the amount paid by Medicare and other federal healthcare programs.  The Realtors allege that McCoy routinely bypassed normal vessels

---

[7]  Amended Complaint, ¶ 29.

[8]  Amended Complaint, ¶ 30.

in order to obtain more reimbursement from Medicare and other federal healthcare programs.[9]  In addition to the obvious financial incentives, the Relators suggest that Dr. McCoy performed medically unnecessary procedures to assist St. Edward in building a successful cardiovascular surgery program and in reaping the corresponding financial rewards.

Dr. Harrison asserts that Dr. McCoy performed surgery on each and every patient Dr. Harrison referred to him.  Dr. Harrison states from approximately 1997 to 1999, he re-reviewed heart catheterization studies "on a number of his patients and discovered that a number of patients proceeded to surgery for a discrete number of bypass grafts only to return from surgery with needless, additional grafts on normal coronary arteries."[10]  Dr. Harrison gives the example of "John Doe" who was referred to Dr. McCoy for two-vessel coronary artery bypass surgery, received five-vessel surgery, and on whom Dr. Harrison concluded that three vessels were bypassed unnecessarily.[11]  Dr. Harrison is alleged to have personally reviewed films at St. Edward of no fewer than seven instances.[12]  Finally, Dr. Harrison personally confronted Dr. McCoy about the issue, and Dr. McCoy is alleged to have stated that this practice was "'precautionary.'"[13]  Subsequently, Dr. Harrison began sending his patients to other cardiovascular surgeons.

Subsequently, St. Edward's CEO Mike Morgan "confronted Harrison and stated that he would not allow any of Harrison's patients to be transferred from St. Edward unless approved by

---

[9]  Amended Complaint, ¶ 37, 42-44.

[10]  Amended Complaint, ¶ 42.

[11]  Amended Complaint, ¶ 43.

[12]  Amended Complaint, ¶ 44.

[13]Amended Complaint, ¶ 45.

McCoy."[14]  Dr. Harrison states that Morgan threatened him with suspension of his privileges if he persisted in attempting to transfer patients to cardiovascular surgeons at other facilities.[15]

Dr. Harrison further contends that Dr. Waack, while serving as chair of the CABG/Specials committee, reproached Harrison for performing too many angioplasties, telling him that "McCoy needed more patients for surgery and that Harrison should instead choose surgery more often and send McCoy more patients."[16]

Dr. Harrison states that over time, he realized that adverse patient outcomes of Cooper Clinic physicians (of which Dr. McCoy was one) "were incorrectly reported, or were concealed or obscured, and were not presented to the peer review committee" thereby allowing Drs McCoy, Waack, and Foreman "to perform their procedures with very little or nonexistent oversight."[17]

The Amended Complaint alleges that Dr. McCoy experienced higher than normal mortality and morbidity rates of approximately 8% as compared to the normal rate of less than 2% for coronary artery bypass surgery.[18]  St. Edward, Cooper Clinic and certain Cooper Clinic physicians are alleged to have acted in concert to prevent Dr. McCoy's true mortality and morbidity rate from being discovered by oversight committees and agencies.[19]

---

[14] Amended Complaint, ¶ 47.

[15] Amended Complaint, ¶ 48.

[16] Amended Complaint, ¶ 49.

[17] Amended Complaint, ¶ 50.

[18] Amended Complaint, ¶ 51.

[19]  Amended Complaint, ¶ 52.

The Amended Complaint recites 60 specific examples of unnecessary procedures performed by Dr. McCoy on Medicare beneficiaries  – 19 at St. Edward and 41 at Sparks.[20]

Defendants are alleged to have submitted many false claims to the United States for unauthorized payments and reimbursements, as a result of which the United States has been damaged monetarily.  There is no effort in the Amended Complaint to identify any specific claims actually submitted to the federal government.[21]

The Relator Plaintiffs seek to recover treble damages, civil penalties, and attorney's fees.

## III.   LEGAL STANDARD

Defendants challenge this Court's subject matter jurisdiction and request a dismissal pursuant to Fed. R. Civ. P. 12(b)(1).  Both parties have presented materials outside the record to support their respective positions.  The Court is free to consider jurisdictional facts outside the pleadings in considering its subject matter jurisdiction.[22]  "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's

---

[20]  Amended Complaint, ¶ 56, pp. 14-24.

[21]  Such is the basis for the Defendants' persuasive contention that the Amended Complaint fails to state a claim under the False Claims Act.  The lack of any information regarding specific claims is problematic, both under Fed. R. Civ. P. 9(b) and to satisfy minimal standards of notice pleading.  For example, it appears that Defendants may have legitimate statute of limitations defenses to a number of the allegedly false claims, but there is no way to apply the six-year limitations period because it can not be determined whether and when a claim was actually submitted to the federal government.  Further, since many claims are based on the allegation that Dr. McCoy did too many grafts during a necessary procedure, presentation of the claims information becomes even more critical for the Defendants to be able to defend against the Relator's theory of wrongdoing.

[22]  *See Osborn v. United States*, 918 F.2d 724, 729-30 (8th Cir. 1990).

allegations.[23]   Here, the facts relevant to the Court's jurisdiction appear undisputed.  Thus, the

jurisdictional issue before the Court requires only the application of law to those undisputed

facts.

Relators, as the parties invoking federal jurisdiction, have the burden to establish the

district court's jurisdiction under the FCA.[24]

## IV.     FACTUAL BACKGROUND

The jurisdictional issue is presented by the public disclosure, original source requirements

of 31 U.S.C. § 3730(e)(4).  Before taking that issue up, the Court will discuss the facts  to which

the law must be applied.  The facts are taken from the Complaint, Amended Complaint, and extra

materials submitted by the parties.  Again, the facts appear to be undisputed.

### (A)     Additional information regarding the parties

Paul Montgomery is a former patient of Dr. McCoy's.  Dr. McCoy performed two

operations on Mr. Montgomery in 1998, coronary artery bypass surgery in June and bypass

surgery on his legs in August.  Following complications from the latter surgery, Mr.

Montgomery's leg was amputated.  In 2000, Mr. Montgomery sued Dr. McCoy for medical

malpractice.  The jury found in Montgomery's favor on the bypass surgery on his legs, but

rejected his claim in connection with the heart bypass surgery.

Lonnie Harrison, M.D. was a practicing cardiologist at St. Edward from 1994 until early

2000.  In 2003, his medical license was revoked after he was convicted of a felony drug charge

---

[23] *Id.* (omitting citation and internal quotes).  *See also Williamson v. Tucker*, 645 F.2d
404, 413 (5th Cir. 1981)(district court has power to decide disputed factual issues in a motion
under Rule 12(b)(1)).

[24] *Id.; see also Hays v. Hoffman*, 325 F.3d 982, 987 (8th Cir. 2003).

for which he was sentenced to five years' probation.  Harrison was involved in assisting

Montgomery in pursuing the malpractice action against Dr. McCoy.

Dr. McCoy is a cardiovascular thoracic surgeon.  From 1993 through May 2000, Dr.

McCoy was a member of the Cooper Clinic and performed most of his surgeries at St. Edward.

After leaving the state for one year, Dr. McCoy returned to Ft. Smith, and joined Western

Associates, an independent physician practice group.  At that time, Dr. McCoy began performing

most of his surgeries at Sparks Regional Medical System ("Sparks").

The Relators contend that there was a competition between St. Edward and Sparks to

develop and maintain a cardiovascular surgery program, and that this competition, combined

with financial incentives, motivated St. Edward to support Dr. McCoy in the alleged practice and

pattern of performing medically unnecessary cardiac and vascular surgical procedures.

**(B)     Complaint versus Amended Complaint**

Part of Defendants' contentions are rooted in the differences between the original

Complaint and the Amended Complaint.  While the original Complaint identifies broad

allegations of presenting false claims for payment of medically unnecessary surgical and

interventional services, it identifies only 2 specific individuals alleged to have received

unnecessary medical procedures at the hands of Dr. McCoy.[25]  Those individuals are: (1)  Relator

Montgomery, on whom Dr. McCoy is alleged to have performed two unnecessary bypass

procedures in 1998; and (2)  D.U., on whom Dr. McCoy is alleged to have performed medically

unnecessary cardiac bypass surgery.[26]   It is undisputed that neither Montgomery nor D.U.

---

[25]  (Complaint at ¶¶ 51- 80 (re: Montgomery) and ¶¶ 81- 88 (re: D.U.)).

[26]  A third patient, V.M. is alleged to have been the recipient of an unnecessary medical procedure performed by Dr. Foreman.  Dr. Foreman is not named as a Defendant in the Amended Complaint.  (Complaint at ¶¶ 89-94).

received Medicare (or other federal funds).  Both were privately insured.  Accordingly, the Relators' claims of medically unnecessary procedures, based on Montgomery and D.U., could not possibly form the basis for a valid claim under the False Claims Act.  Thus, there is nothing in the originally-filed Complaint to support a claim under the False Claims Act other than the general and non-patient specific allegations of Dr. Harrison.  Those allegations do not state a valid claim under the False Claims Act.

After the United States declined to intervene, the Relators drafted and filed a First Amended Complaint.  The Amended Complaint identifies sixty Medicare beneficiaries, all patients of Dr. McCoy's, on whom Dr. McCoy is alleged to have performed medically unnecessary procedures for which he and/or St. Edward billed the federal government.  Nineteen of the patients were treated at St. Edward on dates ranging from September 1998, to July 19, 2004.[27]  Forty-one of the patients were treated at Sparks Regional Medical System on dates ranging from December 16, 1998, to July 20, 2005.[28]

In the Amended Complaint, Dr. Harrison offers his medical opinion as to why the identified sixty procedures were medically unnecessary.  As to some patients, Dr. Harrison opines that the entire bypass surgery was unnecessary.  As to others, Dr. Harrison opines that Dr. McCoy performed unnecessary grafts to vessels which did not need it.  The bulk of the Amended Complaint is devoted to alleging and providing support for the allegations that Dr. McCoy routinely and systematically over-treated his patients and that St. Edward knew and covered up his medical malpractice.  While the Amended Complaint concludes that Dr. McCoy "knowingly,

---

[27]  (Amended Complaint at ¶ 56 (1), pp. 14-17).

[28]  (Amended Complaint at ¶ 56 (2), pp. 17-24). Sparks Regional Medical System is among the Defendants named in the original Complaint, but dropped from the Amended Complaint.

systematically, routinely and repeatedly submitted false claims to and received reimbursements from Medicare and other federal health care programs" for the medically unnecessary procedures he performed, the Amended Complaint is devoid of any specific allegations of false claims.  That is, there are no allegations regarding which claims were submitted, who submitted them, what procedures were charged, which procedures should not have been charged, or the amount the federal government was overcharged.   The Amended Complaint explains the deficiency by noting that:

> Discovery will be necessary to identify each false claim, record, statement for the following reasons:
>
> > a.  this case involves sophisticated schemes to defraud that were perpetrated by numerous individuals, corporations, and related business entities;
> > b.  the false claims presented, and the false records and statements made, used, or caused to be made or used by Defendants in furtherance of their schemes are numerous and were presented over an extended period of time; and
> > c.  documents evidencing many of the false claims, records and statements are peculiarly within the possession of Defendants.[29]

Defendants seize upon the lack of specificity, contending that Plaintiffs have failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).[30]   While it is not necessary to reach this issue in light of its holding that jurisdiction is lacking, the Court notes that the lack of

---

[29]  (Amended Complaint at ¶ 27).

[30]  The rule requires that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."  *See United States ex rel. Woods v. N. Ark. Reg.'l Med. Ctr.*, No. 03-3086, 2006 WL 2583662, at * 2 (W.D. Ark. Sept. 7, 2006)(dismissing FCA claim under Rule 9(b) for failure to identify the time, place, and content of the fraudulent claims); *see also United States ex rel. Joshi v. St. Luke's Hosp. Inc.*, 441 F.3d 552, 559-61 (8th Cir. 2006), *cert. denied*, 127 S.Ct. 189 (2006)(refusing to relax Rule 9(b)'s pleading requirements and allow discovery by the relator to "fill in the blanks" following discovery).

specificity in the Amended Complaint has other implications for the jurisdictional inquiry,

independently of the alleged pleading deficiency.

## V.   DISCUSSION

The Amended Complaint contains three counts, alleging violations of three different

provisions of the False Claims Act ("FCA").

Title 31 U.S.C. § § 3729(a)(1), (2), and (3) provide:

> Any person who--
> (1) knowingly presents, or causes to be presented, to an officer or
> employee of the United States Government or a member of the
> Armed Forces of the United States a false or fraudulent claim for
> payment or approval; [or]
>
> (2) knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or
> fraudulent claim allowed or paid;
> . . .
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person, . . .

To impose liability under the FCA, "no proof of specific intent to defraud is required" but

rather, actual knowledge, deliberate ignorance, or reckless disregard will suffice to satisfy the

element of "knowingly" or "knowing."  31 U.S.C. § 3729(b).

### **Jurisdictional limitation for publicly disclosed allegations or transactions**

In 1986, Congress amended the FCA to add a limitation on subject matter jurisdiction for

cases based on publicly disclosed information.  Congress did so to strike a balance between

encouraging "those with knowledge of fraud against the government to bring that information to

the fore" while "avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud."[31]

The provision, codified at 31 U.S.C. § 3730(e)(4)(A), provides in pertinent part:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Section 3730(e)(4)(B) defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."

Earlier this year, the United States Supreme Court confirmed that the requirements of § 3730(e)(4) are jurisdictional in the sense that they pertain to the Court's subject matter jurisdiction, that is, its very power to hear the case.[32]  Defendants assert, based upon § 3730(e)(4), that the Court lacks jurisdiction over the claims in the Amended Complaint. Relators counter that there has been no public disclosure, or alternatively, if there has been, that Dr. Harrison is an original source of the information on which the allegations are based.[33]

To resolve this issue, the Court must answer the following three questions:

> (1)  Have allegations made by the relator been "publicly disclosed" before the quit tam action was brought?

---

[31]  *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992);  *see also Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032,1041-42 (8th Cir. 2002)(tracing the history of the FCA and amendments thereto).

[32]  *Rockwell International Corp. v. United State et al.*, 127 S.Ct. 1397, 1405-06 (2007).

[33]  Relators concede, correctly so, that Paul Montgomery may not be considered an original source.

(2)  If so, is the qui tam suit "based upon" the public disclosure"? and

(3)  If so, was the relator an "original source" of the information on which the allegations were based?[34]

**(1)    Has there been a public disclosure?**

The analysis necessarily begins with determining whether there has been a "public disclosure."   Unless there has been a public disclosure, there is no need to inquire regarding whether the Relators qualify as "original sources."[35]   Defendants argue that the allegations in Plaintiff's Amended Complaint were publicly disclosed by the following:  (1) Relator Montgomery's malpractice lawsuit against Dr. McCoy;  (2) the state's investigation into the allegations; and (3) the federal investigation into the allegations.   The Court focuses its inquiry on the last contention.

Both Defendants contend that the Government's use of its subpoena powers during the seal period to acquire medical records from federal authorities, which were then provided to Relator Harrison, constitutes a public disclosure.  Relators argue that the alleged public disclosure occurred <u>after</u> the filing of the original complaint and therefore does not trigger the public disclosure inquiry.  For the reasons stated below, the Court agrees that a public disclosure occurred during the United States' investigation into the Relator's allegation.

On May 16, 2005, Harrison and his attorneys met with then Assistant United States Attorney Doug Chavis.   Mr. Chavis describes this meeting and the resulting subpoenas in a

---

[34]  *Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1042-43 (8th Cir. 2002); *U.S. ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003).

[35]  *United States ex rel. Barth v. Ridgedale Elect., Inc.*, 44 F.3d 699 702 (8th Cir. 1995); *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (8th Cir. 1994)(Court proceeds to the "original source" inquiry "[i]if-and only if" it determines that there has been a public disclosure of the "allegations or transactions" upon which the suit is based).

sworn declaration, a copy of which is attached as Exhibit 2 to Relators' response briefs.[36]  Also

present was an agent from the U.S. Department of Health and Human Services, Office of

Inspector General ("HHS-OIG").  During the meeting, Harrison and his counsel presented the

claims alleged in their original Complaint, which had been filed under seal and was at that time

pending in the United States District Court, Eastern District of Missouri, St. Louis Division.  As

a result of that meeting, HHS-OIG caused subpoenas to be issued to St. Edward to obtain records

concerning paid Medicare claims relating to bypass surgeries performed by Dr. McCoy.[37]  As

described by former U.S. Attorney Chavis, "[i]n furtherance of the government's investigation,

Harrison reviewed records as they were intermittently produced pursuant to the subpoenas

concerning McCoy's bypass surgeries and identified surgeries which in his opinion were

medically unnecessary.  The records Harrison reviewed related to paid Medicare claims and his

review was pursuant to [a] Confidentiality Agreement."[38]   The Confidentiality Agreement, a

copy of which is attached to Doug Chavis' declaration, states that Harrison acknowledges that he

is "providing services to the Government in support of a civil law enforcement investigation that

may lead to the filing of a lawsuit or lawsuits by the United States" and that Harrison agrees to

keep any information received or documents provided confidential.

On October 5, 2006, Doug Chavis, Assistant United States Attorney, released a summary

from the United States' "ongoing investigation into the allegations of the Qui Tam complaint" to

attorneys Sherry Bartley and Glenn Grossenbacher, attorneys for St. Edward and Dr. McCoy,

respectively.  Attached to Chavis' letter is a document titled "Review of Femoral/Popliteal

---

[36]  Docket # 59 and # 60.

[37]  A copy of the HHS-OIG subpoenas directed to St. Edward are attached as Exhibits 5 and 6 to Dr. McCoy's brief.

[38]  Chavis declaration, Exh. 2 to Relators' response.

surgical cases by Dr. Mark McCoy Reviewed by Relator Lonnie Harrison, M.D. - September 2006." The documents lists 61 surgical patients of Dr. McCoy along with the concerns of Relator Harrison based on his review of the subpoenaed documents from HHS-OIG.

The Relators concede that the Government's "disclosure to Harrison of records from which he could identify the unnecessary bypass surgeries, based upon his special qualifications, training and experience, [together with] the October, 2006 Chavis letter and enclosed summary, which was prepared by Harrison, do disclose the unnecessary surgeries alleged in this *qui tam* action."[39] But, they argue that such disclosures do not constitute a "public disclosure" within the meaning of the statute based solely upon the fact that they were made after the original Complaint was filed on June 1, 2005, but prior to the filing of the Amended Complaint on October 12, 2006. The Court rejects this theory and concludes that the October 5, 2006, disclosures were "public disclosures" within the meaning of § 3730(e)(4)(A).

In so holding, the Court reaches what appears to be the consensus view of every court to consider the issue.[40] The comments of another district court, in confirming that § 3730(e)(4)(A) applies equally to public disclosures made after the complaint, but before the amended pleading, are equally applicable here:

> To allow [the relator] to rely on publically disclosed information to make her case simply because disclosure came after her (unsustainable) complaint was filed is to make application of the public disclosure bar a function of a fortuity having no necessary relationship to the goals of the 1986 amendment. There is no principled difference between a *complaint* based upon information

---

[39] Relator's brief opposing McCoy's motion, docket # 59, at p. 21.

[40] *See, e.g., United States ex rel. Bledsoe v. Cmty. Health Sys, Inc.*, 342 F.3d 634, 645-46 (6th Cir. 2003); *United States ex rel. Bannon v. Edgewater Med. Ctr.*, 406 F.Supp.2d 907, 924 (N.D. Ill. 2005); *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 255 F.Supp.2d 351, 367 n. 15 (E.D. Pa. 2002), *aff'd on other grounds*, 473 f.3d 506 (3d Cir. 2007).

> contained in public disclosures (of which [the relator] was not a
> source) and an *amended complaint* that is based upon and can only
> be sustained by resort to that information. The goal of prohibiting
> parasitic suits requires application of the public disclosure bar in
> the latter case no less than in the former.[41]

The approach advocated by Relators would also be contrary to the statutory interpretation

of § 3730(e)(4) provided by the Supreme Court in the recent case of *Rockwell v. United States*.[42]

*Rockwell* did not specifically address the "public disclosure" half of the equation,[43] but was

instead focused on whether the relator could be considered an "original source." The *Rockwell*

Court resoundingly rejected the relator's contention that his "original source" status should be

determined solely with respect to the allegations in the original complaint, requiring instead that

the relator satisfy the original-source exception through all stages of the litigation. As the

Supreme Court noted:

> Absent some limitation of § 3730(e)(4)'s requirement to the
> relator's initial complaint, we will not infer one. Such a limitation
> would leave the relator free to plead a trivial theory of fraud for
> which he had some direct and independent knowledge and later
> amend the complaint to include theories copied from the public
> domain or from materials in the Government's possession. Even
> the Government concedes that new allegations regarding a
> fundamentally different fraudulent scheme require reevaluation of
> the court's jurisdiction.

*Id.*, at 1408.

---

[41] *United States ex rel. Bannon v. Edgewater Med. Ctr.*, 406 F.Supp.2d 907, 924 (N.D. Ill. 2005).

[42] 127 S.Ct. 1397 (2007).

[43] The *Rockwell* Court was not called upon to consider whether there had been a public disclosure of the allegations in question because that point was conceded. *Id.*, at 1405, n. 1. Apparently, while the FCA claim was proceeding, Rockwell pled guilty to ten environmental violations in a federal criminal action. *See U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 282 F.3d 787, 794 (10th Cir. 2002), rev'd in part by *Rockwell v. U.S.*, 127 S.Ct. 1397 (2007).

The same rationale applies equally to public disclosures.  There is no statutory basis upon which to infer the proposed temporal limitation to the determination of whether a public disclosure has occurred.  Further, to infer such a limitation would seriously erode the purpose of the jurisdictional bar.  Here, it would permit Dr. Harrison, who disagreed with Dr. McCoy's medical diagnosis and treatment of patients, to use records later obtained from the Government over a broad period of time to mine for facts to support a False Claims Act case against Dr. McCoy.  This is the very danger for which § 3730(e)(4) was enacted to prevent.

The Court concludes that a "public disclosure" within the meaning of § 3730(a)(4) occurred when Assistant United States Attorney Doug Chavis released his October 5, 2006 letter to counsel for St. Edward and Dr. McCoy, along with the summary from the Government's investigation.

**(2)**      **Is the Amended Complaint based on the disclosure?**

"Plaintiffs acknowledge that the information concerning the representative examples of unnecessary surgeries performed by McCoy on Medicare patients which were added to Plaintiffs' Amended Complaint were derived from Harrison's review and evaluation of documents produced pursuant to the HHS-OIG subpoenas."[44]  This concession demonstrates that the allegations in the Amended Complaint are based upon the disclosures the Court has determined to be "public disclosures" within the meaning of § 3730(e)(4)(A).

---

[44]  Plaintiffs' brief in opposition to McCoy's motion, docket # 59, at p. 21.

(3)   **Do Relators have the knowledge necessary to be considered an original source?**

The Relators do not dispute that Paul Montgomery may not be considered an "original source." His only direct knowledge was derived as a patient of Dr. McCoy's, which experience can not possibly give rise to a legitimate FCA claim.

The Court must determine whether Dr. Harrison may be considered an "original source." As to Dr. Harrison, the Court rejects his theory that he is an original source merely because he personally recalls referring some unidentified patients to Dr. McCoy, after which Dr. McCoy overtreated them – either by performing surgery where none was needed or by operating on too many vessels.[45] Relators urge the Court to separate the contentions regarding their failure to plead fraud with particularity. But, at this juncture, such contentions become intertwined with, or at least relevant to, the jurisdictional argument. Relators argue that because Dr. Harrison "was certain at the filing of this action, and presently, is certain, that some of his patients on whom McCoy performed unnecessary bypass surgeries or grafts were Medicare beneficiaries" as to which he "triggered the government's investigation through which documents produced pursuant [to] subpoenas have, at least in part, confirmed his allegations."[46] The Court agrees with Defendants that such contention is tantamount to a "catalyst" theory, which the Eighth Circuit has rejected.[47]

Despite the Relators' broad allegations of "knowledge," the original Complaint failed to identify any Medicare patients whom Dr. McCoy overtreated or for whose treatment he billed the

---

[45] *See* Harrison Declaration, Exh. 1 to Pl.'s response, docket # 59, at 1-3.

[46] Relators' brief, docket # 59, at p. 26.

[47] *Hays*, 325 F.3d at 989-90 (*citing Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995)).

federal government.  The only two patients identified by the Relators [as patients of Dr. McCoy] were private pay patients, which could never form the basis for a legitimate FCA claim.  It was not until the Amended Complaint was filed that the Relators even potentially stated a claim for the submission of false claims to the federal government, the *sina qua non* of a False Claims Act.  "The FCA attaches liability, not to the underlying fraudulent activity, but to the ' claim for payment.'"[48]  The only potential FCA claims alleged in the Amended Complaint are the sixty identified Medicare patients who allegedly received unnecessary procedures for which Medicare paid.[49]   Accordingly, in asking whether Harrison is an "original source," the appropriate inquiry is whether he may be considered an original source of his allegations that the Defendants submitted false claims to the federal government in connection with the sixty (60) patients identified in the Amended Complaint.

Direct and independent knowledge must be something more than "secondhand information" or "collateral research and investigations."[50]  "A relator has direct knowledge when he sees it with his own eyes."[51]  It is undisputed that Dr. Harrison obtained the identity of the Medicare patients in question from the federal government.  He therefore cannot qualify as an original source because he lacks the required "direct and independent knowledge of the information on which the allegations are based" as required by § 3730(e)(4)(B).  As the Supreme

---

[48]  *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998).

[49]  Defendants have also questioned whether the Relators can prove that such false claims were "objectively false" as required to prevail, and not merely differences in opinion as to appropriate medical treatment.  This also poses a serious issue, which would have to be resolved if the case proceeded.

[50]  *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995)(internal quotation marks omitted).

[51]  *U.S. ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003).

Court made clear in *Rockwell*, Dr. Harrison must demonstrate that he has direct and independent

knowledge to support the alleged FCA claims contained in the Amended Complaint, specifically,

the sixty Medicare patients identified therein.

For all of the reasons stated above, the Court concludes that Dr. Harrison lacks the direct

and independent knowledge required to be considered an original source as to any of the sixty

patients in question.  In rejecting Relators' arguments to the contrary, the Court rejects an

interpretation of § 3730(e)(4) which would "leave the relator free to plead a trivial theory of

fraud for which he had some direct and independent knowledge and later amend the complaint to

include theories copied from the public domain or from materials in the Government's

possession."[52]

## CONCLUSION

For the reasons herein stated,

IT IS HEREBY ORDERED THAT Separate Defendant St. Edward Mercy Medical

Center's Motion to Dismiss (Docket No. 40) and Separate Defendant Dr. David Mark McCoy's

Motion to Dismiss (Docket No. 47) be, and they are hereby, GRANTED.  The Relators' claims

against Dr. McCoy and St. Edward Mercy Medical Center are hereby DISMISSED for lack of

subject matter jurisdiction.

IT IS SO ORDERED this  28th    day of September, 2007.

_/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE

---

[52] *Rockwell*, 127 S.Ct. at 1408.